IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HTK HAWAII, INC.,<br><br>            Plaintiff,<br><br>vs.<br><br>KEVIN SUN, NICOLE YANG,<br><br>            Defendants. | Civ. No. 15-00114 JMS-RLP<br><br>ORDER: (1) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, ECF NO. 146; AND (2) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, ECF NO. 154; EXHIBIT "A" |

## ORDER: (1) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, ECF NO. 146; AND (2) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, ECF NO. 154; EXHIBIT "A"

## I. INTRODUCTION

Plaintiff HTK Hawaii, Inc. ("HTK Hawaii") is solely owned by

William Hsia, president of HTK Hawaii. Kimberly Hsia, William Hsia's wife, is

secretary and treasurer of HTK Hawaii. HTK Hawaii brings this action against

Defendants Kevin Sun and Nicole Sun (formerly "Nicole Yang") primarily seeking

a declaratory judgment that a document titled "Contract Agreement for HTK

California" ("the Document") is not an enforceable contract.[1] A business

arrangement between William Hsia and Kimberly Hsia ("the Hsias") and

Defendants Kevin Sun and Nicole Sun ("the Suns"), originally created to help the

_____

[1] A copy of the Document is attached to this Order as Exhibit "A."

Hsias expand HTK Hawaii's mainland business, fell apart, leading to this litigation.

The Suns filed a counterclaim against HTK Hawaii and, as Third-Party Plaintiffs, filed claims against the Hsias in their individual capacities. The counterclaim alleges multiple claims, primarily breach of contract -- related to the Document -- and various employment law violations. Because Plaintiff HTK Hawaii, Third-Party Defendant William Hsia, and Third-Party Defendant Kimberly Hsia are closely related and argue as one, they will be collectively referred to as "HTK."

Currently before the court is the Suns' Motion for Summary Judgment ("Suns' Motion"), ECF No. 146, and HTK's Counter-Motion for Partial Summary Judgment ("HTK's Motion"), ECF No. 154. For the reasons that follow, the court DENIES the Suns' Motion and GRANTS in part and DENIES in part HTK's Motion.

## II.  **BACKGROUND**

### A.    **Factual Background**

William Hsia is the president and sole owner of HTK Hawaii. ECF No. 147-5, at 7:3-16. Kimberly Hsia, William Hsia's wife, is the secretary and

treasurer of HTK Hawaii.  *Id.* at 8:15-18.  HTK Hawaii sells shave ice products. ECF No. 155-2, ¶ 1.

The Suns are residents of California.  ECF No. 155-3, Ex. 1.  William Hsia and Kevin Sun first met sometime in 2007.  ECF No. 155-2, ¶ 7.  On June 10, 2013, Kevin Sun sent William Hsia an email seeking employment with HTK Hawaii.  ECF No. 155-6, Ex. 4.  Sometime shortly thereafter, Kevin Sun began working for HTK Hawaii in California.  ECF No. 155-2, ¶¶ 9-10; ECF No. 147-1, ¶¶ 9-11.  The nature of this employment relationship is at issue in this litigation.

In October 2013, the Hsias went to California to meet with the Suns. ECF No. 155-2, ¶ 13; ECF No. 147-1, ¶ 12.  The Hsias and the Suns discussed a potential business arrangement where the Suns would purchase 50% of the mainland business and help expand it.  ECF No. 155-2, ¶¶ 13-14; ECF No. 147-1, ¶ 12.  William Hsia and Kevin Sun subsequently exchanged several emails discussing the specifics of the potential partnership.  ECF No. 155-8, Ex. 6 (memorializing the conversation in California); ECF No. 147-8, Ex. 4 (answering follow up questions about the potential partnership).

Between November 30, 2013, and December 5, 2013, William Hsia and Kevin Sun exchanged a series of emails negotiating specific terms to be included in any agreement.  ECF No. 155-9, Ex. 7; ECF No. 147-10, Ex. 6.

In these emails, the parties explicitly used phrases such as "Current counter offer by W and K" and "Current revised 2nd offer by K and N" to label proposed terms for the potential agreement.  ECF No. 155-9, Ex. 7; ECF No. 147-10, Ex. 6.

The Hsias drafted the Document to reflect the terms discussed in the emails.  ECF No. 155-11, Ex. 9; ECF No. 147-12, Ex. 8.  The first paragraph of the Document describes the agreement: "The buyers are hereby agreeing to purchase and be responsible for 50% of all gross sales and profits of HTK Hawaii's sales in the mainland for the sum of $250,000 paid over the period of three years starting January 2014."  ECF No. 155-11, Ex. 9; ECF No. 147-12, Ex. 8.  The remainder of the Document consists of twenty-one bullet points, setting forth "contract terms and conditions."  *Id.*  As an example, the first bullet point states: "Selling price of $250,000 paid through 3 years starting January 2014."  *Id.*  The Hsias signed the Document on December 12, 2013, and the Suns signed the Document on December 26, 2013.  ECF No. 155-11, Ex. 9; ECF No. 147-12, Ex. 8.  After both parties signed the Document, they continued to discuss details of the arrangement by email.  ECF No. 155-12, -13, Ex. 10-11.

On January 1, 2014, William Hsia and Kevin Sun signed a partnership agreement to create HS International.  ECF No. 147-16, Ex. 12.  For several months after that, the relationship continued amicably.  ECF No. 154-2, at 8; ECF

No. 147-1, ¶ 27; ECF No. 147-2, ¶ 10.  And, several payments (the purposes of which are in dispute) were made between the parties -- on January 23, 2014, the Suns paid the Hsias $10,000; on March 3, 2014, the Suns paid the Hsias $39,314.07; and on July 1, 2014, Kimberly Hsia paid Kevin Sun $99,077.62.  ECF No. 147-17, Ex. 13; ECF No. 147-19, Ex. 15.  Pursuant to the Document, Kevin Sun received a monthly salary of $3,000; these payments began January 2014 and ended September 2014.  ECF No. 147-5, Ex. 1, at 96:8-12; ECF No. 147-1, ¶ 25.

On November 20, 2014, William Hsia formed Hawaiian Snow Nevada, Inc. ("Hawaiian Snow Nevada"), a Nevada corporation, without the Suns' knowledge.  ECF No. 180-23, Ex. 20; ECF No. 188, at 11.  On January 2, 2015, Kimberly Hsia emailed the Suns about Nicole Sun's upcoming trip to Hawaii, noting that the Hsias "had been working with [their] lawyer to draft up a term sheet for [their] engagement."  ECF No. 147-23, Ex. 19.  On January 3, 2015, Kimberly Hsia emailed the Suns listing reasons why she wanted to change their business arrangement to a "40/60" split from their existing 50% split.  ECF No. 147-24, Ex. 20.  On January 7, 2015, Nicole Sun emailed Kimberly Hsia refusing to agree to the "40/60" split.  ECF No. 147-25, Ex. 21.

Sometime in January 2015, William Hsia changed the locks and passwords to HTK's mainland business operations, preventing the Suns from

5

operating the business.  ECF No. 147-5, Ex. 1 at 149:2-8.  The Hsias never paid the

Suns for the profits from the second half of 2014, and the Suns never paid any

portion of the $250,000 purchase price.  *Id.* at 146:11-16; ECF No. 155-4, Ex. 2, at

78:12-79:11.

## B.     Procedural Background

Kevin Sun filed a Notice of Removal from the Circuit Court of the

First Circuit, State of Hawaii, on April 2, 2015.  ECF No. 1.  HTK Hawaii filed a

First Amended Complaint on September 8, 2015.  ECF No. 51.

Kevin Sun filed a Motion to Transfer and a Motion to Dismiss on

November 23, 2015.  ECF No. 58; ECF No. 61.  On January 25, 2016, the court

denied Defendants' Motion to Transfer Venue, and granted in part and denied in

part Defendants' Motion to Dismiss.  ECF No. 77.

HTK Hawaii filed a Fourth Amended Complaint on March 3, 2016,

asserting the following claims against the Suns: (1) declaratory judgment that the

Document is not a binding contract; and (2) unjust enrichment.  ECF No. 92.

The Suns filed a Counterclaim against HTK Hawaii on March 17,

2016, asserting the following claims against HTK Hawaii: (1) breach of contract;

(2) unjust enrichment; (3) breach of the implied covenant of good faith and fair

dealing; (4) conversion; (5) fraud; (6) failure to timely pay wages; (7) failure to

timely pay wages at termination; (8) failure to pay overtime; (9) failure to provide itemized wage statements; and (10) unlawful and unfair business activity.  ECF No. 105.

The Suns filed a Third Party Complaint against the Hsias in their individual capacities on March 18, 2016, with Counts 1-3, 6, and 7 reasserting Counts 1-5 and 10 of their Counterclaim, respectively, and adding claims for promissory estoppel and breach of fiduciary duty.  ECF No. 106.

On July 27, 2016, the Suns filed a Motion for Summary Judgment on their breach of contract claim against HTK Hawaii and the Hsias and on both counts in HTK Hawaii's Fourth Amended Complaint.  ECF No. 146.  On August 3, 2016, the Hsias filed a Motion for Partial Summary Judgment as to Counts 1, 3, and 5-10 of the Suns' Counterclaim, and Counts 1, 3-5, and 7 of the Suns' Third-Party Complaint.  ECF No. 154.  On September 2, both parties filed their Opposition briefs, and on September 12, both parties filed their Reply briefs.  ECF No. 179, 181, 187, 188.  A hearing was held on September 26, 2016. Supplemental letter briefing was provided to the court on September 30, 2016.

## III.  STANDARD OF REVIEW

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial.*"  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV. <u>DISCUSSION</u>

### A.   Cross Motions Concerning the Document's Contractual Validity

The Suns contend that the Document is a binding contract, while HTK contends that the Document is an unenforceable "term sheet." The parties have filed cross motions for summary judgment on this issue. *See* ECF No. 154; ECF No. 146. HTK attacks the Document's contractual validity by arguing (1) no mutual assent; (2) lack of essential terms; and (3) lack of consideration.[2] *See* ECF No. 154; ECF No. 146. The court addresses each of these arguments in turn.

---

[2] In the event that the Document is a contract, the Hsias argue in the alternative for rescission of the contract due to unilateral mistake. Because there is a genuine issue of material fact concerning the Document's contractual validity, the court declines to reach this argument. And, even if the court reached the merits of this argument, the Hsias have failed to show that the effect of the mistake would make enforcement unconscionable or that the Suns had reason to know of the mistake. *See* Restatement (Second) of Contracts § 153.

And, because the court finds that there is a genuine issue of material fact

concerning mutual assent, the cross-motions are denied.[3]

      *1.    Mutual Assent*

      Under both Hawaii and California law,[4] a valid contract requires

mutual assent. *See, e.g.*, *United Pub. Workers, AFSCME v. Dawson Int'l, Inc.*, 113

Haw. 127, 141, 149 P.3d 495, 509 (2006) ("It is an elementary rule of contract law

that there must be a meeting of the minds on all essential elements or terms in

order to create a binding contract."); *Marin Storage & Trucking, Inc. v. Benco

Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049, 107 Cal. Rptr. 2d 645,

652 (2001) ("Every contract requires mutual assent or consent.").

      "The existence of mutual assent or intent to accept is determined by

an objective standard." *Earl M. Jorgensen Co. v. Mark Construction, Inc.*, 56

Haw. 466, 470, 540 P.2d 978, 982 (1975); *see also Marin Storage*, 89 Cal. App.

4th at 1050, 107 Cal. Rptr. 2d at 652 ("The test is whether a reasonable person

---

    [3] The Suns also move for summary judgment on their breach of contract claim and HTK's unjust enrichment claim. But, as the parties agreed at the September 26, 2016 hearing, both of these claims depend on a finding regarding the Document's contractual validity. Because the court finds that a genuine issue of material fact exists regarding the Document's contractual validity, the court also denies the Suns' motion with regard to these claims.

    [4] Neither party addresses whether Hawaii or California law applies to any claim in their cross motions. Instead, the parties simply cite both Hawaii and California law. The court will not engage in this choice of law analysis without input from the parties, and thus also cites to both Hawaii and California law. Where relevant, the court distinguishes Hawaii and California law.

would, from the conduct of the parties, conclude that there was a mutual agreement."). And because "[t]he intent of the parties is a question of fact, and '[i]nasmuch as the determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable men might differ, summary judgment often will be an inappropriate means of resolving an issue of that character.'" *Hanagami v. China Airlines, Ltd.*, 67 Haw. 357, 364, 688 P.2d 1139, 1145 (1984) (quoting *Bishop Trust Co. v. Cent. Union Church*, 3 Haw. App. 624, 628-29, 656 P.2d 1353, 1356 (Haw. Ct. App. 1983). Here, a genuine issue of material fact exists as to whether the Document is a contract or a term sheet.

Viewing the evidence in the light most favorable to HTK, there is evidence that the Document is a mere "term sheet," to which HTK did not intend to be bound. The face of the Document itself is informal, a collection of several bullet points that could be viewed as resembling an outline of terms for a potential future contract, and not a fully executed contract.[5] ECF 155-11, Ex. 9. And Nicole Sun's deposition testimony that 2014 was a "trial year," ECF No. 155-5, Nicole Sun Dep. 93:25-94:1, is supported by the evidence (again, viewing the evidence in the light most favorable to HTK). A week after the signing of the

---

[5] And although the court finds that the Document's terms are sufficiently clear that it *could* legally constitute a contract, the vagueness of many terms certainly can be viewed as consistent with an outline of a potential future contract.

Document, Kevin Sun emailed Kimberly Hsia seeking to clarify if "the buy-in 50%

of ending inventory [is] applying for th[e] purpose [of company funds in

circulation]."  ECF No. 155-12, Ex. 10.  That same day, Nicole Sun emailed the

Hsias asking "to get the logistics out of the way, and be made known some

concrete numbers, so we can get the business partnership started."  ECF No. 155-

13, Ex. 11.  Read in the light most favorable to HTK, these emails imply that the

Document was not intended as a contract, but instead set forth terms for a potential

contract in the future.  Ten months later, a November 24, 2014 email from Nicole

Sun to Kimberly Hsia states that the Suns "plan to start cost sharing starting in the

new year," despite the Document explicitly stating that costs would be shared --

again, suggesting that the Suns did not think they were bound to the Document.

ECF No. 155-16, Ex. 14.

          Viewing the evidence in the light most favorable to the Suns, the

Document was written after extensive negotiations between November 20, 2013,

and December 5, 2013, where the parties described their emails back and forth as

"Current proposal by W and K"; "Current offering by K and N"; and "Current

counter offer by W and K."  ECF No. 147-10, Ex. 6.  The Document itself is titled

"Contract Agreement for HTK California"; the first paragraph begins "Purpose of

contract: This is a [sic] agreement . . . ."; the Hsias signed the Document as

"Sellers" and the Suns signed as "Buyers"; and the language indicates a final sale: "The buyers are hereby agreeing to purchase . . . ."  ECF No. 147-12, Ex. 8. Pursuant to the Document, the parties executed a "Partnership Agreement," filing relevant paperwork with California.  ECF No. 147-16, Ex. 12.  In July 2014, the Hsias paid $99,077.62 to the Suns, representing exactly 50% of the mainland business' profits from January to June 2014.  ECF No. 147-19, Ex. 15.

Both parties point to specific evidence suggesting that a reasonable fact finder could find in their favor.  And both are correct -- whether or not there was mutual assent to be bound by the Document is a genuine issue for trial.

### 2.  *Essential Terms*

HTK contends that the Document lacks essential terms, invalidating the Document's enforceability.  ECF No. 154-2, at 14-15 (listing ten specific terms).[6]  The court disagrees.

---

[6] Those ten essential terms are:

> (1) the timing and means of the Suns' payments of the $250,000 "buy in" or deposit; (2) the timing and means of the Suns' payments of HTK's operating expenses; (3) the terms of the purchase agreement that HTK and the Suns would eventually have to effect; (4) what actual entity would be created and how it would be legally related to HTK; (5) how profits and losses would be shared or distributed; (6) how to determine whether a customer was a "new" customer of the yet-to-be created entity or a pre-existing customer of HTK; (7) tax and other bookkeeping matters; (8) the structure and management of the entity created pursuant to

First, it is unclear that contracts require specific "essential terms" outside of those involving the sale of land.  The majority of the cases HTK cites explicitly limit their description of essential terms to sales of land.  *See, e.g.*, *Miller v. Pepper*, 2 Haw. App. 629, 631, 638 P.2d 864, 866 (Haw. Ct. App. 1982) (discussing "complete and . . . essential terms" required in "[a]n agreement of sale of land" (quoting *In re Sing Chong Co.*, 1 Haw. App. 236, 239, 617 P.2d 578, 581 (Haw. Ct. App. 1980))); *Molokai Ranch, Ltd. v. Morris*, 36 Haw. 219, 225 (1942) ("It is apparent that many of the usual provisions of contracts for the purchase and sale of real estate were completely omitted.").

Second, assuming that the "essential terms" analysis extends beyond the sale of land to the sale of businesses, and that the Document's contractual validity is governed by Hawaii law rather than California law, the "essential terms" requirement is more limited than what HTK suggests.  "In agreements for the sale of land, the essential terms are 'the identification of the parties, a description of the property sold, the price, the time and manner of payment and any other terms in the agreement which are essential to the agreement.'"  *Globalmart, Inc. v. Posec*

the "Contract"; (9) the method and means of terminating that entity and winding up its affairs; and (10) how to determine whether a breach of the future agreement had occurred and if so, the appropriate remedy for that breach.

ECF No. 154-2, at 14-15.

*Hawaii, Inc.*, 2012 WL 1650697, at *6 (Haw. Ct. App. May 10, 2012) (quoting *In re Sing Chong Co.*, 1 Haw. App. at 239, 617 P.2d at 581).

"[A] contract must be *certain* and *definite* as to its essential terms." *Boteilho v. Boteilho*, 58 Haw. 40, 42, 564 P.2d 144, 146 (1977) (emphasis added). "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Almeida v. Almeida*, 4 Haw. App. 513, 519, 669 P.2d 174, 179 (Haw. Ct. App. 1983). Hawaii law, however, "leans against the destruction of contracts for uncertainty; courts shall favor a determination that an agreement is sufficiently definite*." Hi-Pac, Ltd. v. Avoset Corp.*, 26 F. Supp. 2d 1230, 1235 (D. Haw. 1997) (citing *In re Sing Chong Co.*, 1 Haw. App. at 240, 617 P.2d at 581). "[W]here an agreement does not provide time for performance it must be read as requiring that performance be commenced within a reasonable time." *In re Sing Chong Co.*, 1 Haw. App. at 240, 617 P.2d at 581 (stating this "rule" shortly after listing essential terms in sales of land).

The Document contains all essential terms identified in *Globalmart*. William Hsia and Kim Hsia signed as "Sellers" and Kevin Sun and Nicole Sun signed as "Buyers." ECF No. 155-11, Ex. 9. The Document describes the *business* sold as "50% of all gross sales and profits of HTK Hawaii's sales in the

mainland." *Id.* The price is "$250,000." *Id.* The time and manner of payment are stated as "over the period of three years starting January 2014" and "through 3 years starting January 2014." *Id.* Although HTK lists other terms they believe to be essential to the agreement, they fail to justify why any single additional term is "essential." ECF No. 154-2, at 14-20.

HTK also argues that "over the period of three years" and "through 3 years" are fatally indefinite. Again, the court disagrees. In Hawaii, "courts shall favor a determination that an agreement is sufficiently definite." *Hi-Pac*, 26 F. Supp. 2d at 1235. Here, the three year period was bargained-for -- the Hsias extended it from one year to three in order to justify increasing the sales price from $150,000 to $250,000, and the language used during negotiations was always "within" a certain number of years, not "through" or "over." ECF No. 147-10, Ex. 6. Moreover, the Hsias drafted the Document, and "[a]mbiguities in a contract are construed against the drafter." *Koga Eng'g & Constr., Inc. v. State*, 122 Haw. 60, 72 n.19, 222 P.3d 979, 991 (2010). And finally, Hawaii courts have already found that, "where an agreement does not provide time for performance it must be read as requiring that performance be commenced within a reasonable time." *In re Sing Chong Co.*, 1 Haw. App. at 240, 617 P.2d at 581. All of these factors lead the court to conclude that this provision is sufficiently definite.

16

Last, HTK mischaracterizes the court's January 25, 2016 order as finding that the terms of the Document do not provide a basis for determining the existence of a breach.  Rather, the court found that "neither the [First Amended Complaint] nor the Document provide any indication that Defendants' share of expenses is past due" or any indication that "Defendants were obligated to make a payment toward the purchase price prior to January 2017."  ECF No. 77, at 36-37. As such, these findings are limited by the factual allegations contained in the First Amended Complaint.  If the First Amended Complaint alleged that expenses were not paid "within a reasonable time," *In re Sing Chong Co.*, 1 Haw. App. at 240, 617 P.2d at 581, or if the Hsias waited and the buy-in was not paid by January 2017, the court might have ruled otherwise.

   3.   *Consideration*

HTK next argues that the Suns' consideration in the Document is ineffective because it constitutes an unenforceable illusory promise.  ECF No. 154-2, HTK's Motion, at 24.  Once again, the court disagrees.

It is true that "a return performance that is fully optional cannot constitute consideration."  *Balogh v. Balogh*, 134 Haw. 29, 59, 332 P.3d 631, 661 (2014).  That is, a party cannot "retain[] the unlimited right to decide later the

nature or extent of his performance." *Beverage Distribs., Inc. v. Olympia Brewing Co.*, 440 F.2d 21, 30 (9th Cir. 1971).

       HTK points to the following sell-back provision in the Document:  "If Kevin and Nicole were to see that the business is unfit for their needs, they may have the option to sell the share back to William at the current value provided that everything is in agreeable terms."  ECF No. 155-11, Ex. 9; ECF No. 154-2, HTK's Motion, at 24.  HTK argues that this provision makes the Suns' promise to pay illusory, as it means the "Suns had no skin in the game" because they could "force HTK to repurchase the Suns' share (for which the Suns had not paid)."  ECF No. 154-2, HTK's Motion, at 24.

       If the Document stated that the Suns had to pay "$250,000 for half of the mainland business, or any price they deemed fit," that would constitute a return performance that is "fully optional."  But this is not such a case.  Instead, the sell-back provision does not negate the Suns' promise to assume responsibilities for half of the mainland business from the time the Document is effective to the time of any subsequent sale.  Nor would it directly make the $250,000 payment "fully optional."  It simply permits negotiations ("provided that everything is in agreeable terms") for a sell-back at some future time.  Thus, the agreement to pay $250,000 is not illusory.

**B.      HTK's Summary Judgment Motion Against the Suns' Claims**

*1.      Fraud*

The Suns contend that the Hsias committed fraud by forming a secret

Nevada corporation while maintaining their ongoing business relationship.[7]   HTK

now moves for summary judgment on that claim.

Both Hawaii and California law have similar requirements to establish

a fraud claim:

> (1) false representations were made by defendants, (2) with
> knowledge of their falsity (or without knowledge of their truth
> or falsity), (3) in contemplation of plaintiff's reliance upon
> these false representations, and (4) plaintiff did rely upon them.

*Shoppe v. Gucci Am., Inc.*, 94 Haw. 368, 386, 14 P.3d 1049, 1067 (2000) (internal

quotation marks omitted) (quoting *TSA Int'l, Ltd. v. Shimizu Corp.*, 92 Haw. 243,

255, 990 P.2d 713, 725 (1999)); *cf. Small v. Fritz, Cos., Inc.*, 30 Cal. 4th 167, 173,

65 P.3d 1255, 1258 (2003) ("'The elements of fraud . . . are (a) misrepresentation

(false representation, concealment, or nondisclosure); (b) knowledge of falsity (or

'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and

---

[7] HTK initially claimed that the Suns' fraud claim fails because it relies upon future events.  ECF No. 154-2, at 27-28.  In response, the Suns narrowed their fraud claim to the time period between the formation of the Nevada corporation and the time of the alleged breach of contract.  ECF No. 179, at 27-28.  As a result, the court only addresses this narrow time frame.

(e) resulting damage.'" (quoting *Lazar v. Sup. Ct.*, 12 Cal. 4th 631, 638, 909 P.2d 981 (1996))).

Nondisclosure can qualify as a false representation when "a party to a business transaction is in a fiduciary relationship with the other party." *Matsuda v. Wada*, 101 F. Supp. 2d 1315, 1324 (D. Haw. 1999) (emphasis omitted) ("Fraud can be perpetrated by non-disclosure as well as by affirmative misrepresentation."); *Small*, 65 P.3d at 1258 (reciting the elements of fraud and including "(a) misrepresentation (false representation, concealment, or nondisclosure)").

On November 20, 2014, the Hsias formed a "secret" Nevada corporation named Hawaiian Snow Nevada.[8]  ECF No. 280-23, Ex. 20. Regardless of the Document's contractual validity, the Hsias and the Suns were engaging in an ongoing business relationship at this time, one that did not end until January of the following year.  ECF No. 147-1, Kevin Sun Decl. ¶ 40.

The creation of Hawaiian Snow Nevada, without the Sun's knowledge, supports a fraud claim.  That is, there is a genuine issue of material fact as to whether the Hsias, as of the date of Hawaiian Snow Nevada's incorporation, intended to defraud the Suns -- the false representation is the

---

[8]  The Hsias admit that the first time the Suns became aware of this corporation was during discovery in this litigation.  ECF No. 188, at 11.

ongoing business relationship[9] without the intent to actually continue in business with the Suns.

###### 2.    *Employment Law Claims*

HTK argues that, because Kevin Sun was an "independent contractor" rather than an "employee," the Suns' four employment law claims under the California Labor Code fail as a matter of law.[10]  ECF No. 154-2, at 29-32. Because there is a genuine issue of material fact as to whether Kevin Sun was an employee or independent contractor before the signing of the Document ("pre-Document"), but not in the time period after the signing of the Document ("post-Document"), the court GRANTS in part and DENIES in part HTK's claim.

The California Labor Code defines an employee as "every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully employed."  Cal. Labor Code § 3351.  An "independent contractor" is "any person

---

[9]  After the September 26, 2016 hearing, the Suns submitted supplemental briefing as to evidence establishing an ongoing business relationship at the time of the Hawaiian Snow Nevada's incorporation.  ECF No. 205.  The Suns identified a November 24, 2014 email establishing that the Hsias approved of the formation of an "S-corp" in California, ECF No. 180-17, which is sufficient to create a genuine issue of material fact as to their ongoing business relationship in November 2014.

[10]  The Hsias also argue that Kevin Sun was not an employee under Hawaii law.  ECF No. 154-2, at 31-32.  However, they fail to explain how Hawaii law is relevant to a claim under the California Labor Code.

21

who renders service for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished." Cal. Labor Code § 3353.

To help further distinguish between employees and independent contractors, California courts heavily rely on common law. The primary test[11] is "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *Tieberg v. Unemployment Ins. App. Bd.*, 2 Cal. 3d 943, 946, 471 P.2d 975, 977 (1970); *see also Ali v. U.S.A. Cab Ltd.*, 176 Cal. App. 4th 1333, 1347, 98 Cal. Rptr. 3d 568, 579-580 (Cal. Ct. App. 2009) ("A worker is an independent contractor when he or she follows the employer's desires only in the result of the work, and not the means by which it is

---

[11] Although not addressed by the parties, California courts also use a series of secondary factors to determine the nature of an employment relationship:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Ali v. U.S.A. Cab Ltd.*, 176 Cal. App. 4th 1333, 1347-48, 98 Cal. Rptr. 3d 568, 580 (Cal. Ct. App. 2009).

achieved.").  "Whether a person is an employee or an independent contractor is

ordinarily a question of fact but if from all the facts only one inference may be

drawn it is a question of law."  *Jackson v. AEG Live, LLC*, 183 Cal. Rptr. 3d 394,

413 (Cal. Ct. App. 2015) (quoting *Millsap v. Fed. Express Corp.*, 227 Cal. App. 3d

425, 431, 277 Cal. Rptr. 807 (Cal. Ct. App. 1991)).

Viewing the evidence in a light most favorable to the Suns, several

facts could lead a reasonable fact finder to determine that Kevin Sun was an

employee of HTK during the pre-Document time period.  First, William Hsia had

Kevin Sun sign an "Employee Confidentiality and Non-Disclosure Agreement"

which lists Kevin Sun as an "employee" throughout.  ECF No. 180-6, Ex. 3.

Second, on June 13, 2013, William Hsia emailed Kevin Sun telling

him to fill five specific orders.  ECF No. 180-5, Ex. 2.  Included in these orders are

instructions as to how some of the orders should be filled: "when printing, use

Fedex option 'Express Saver'.  We do not ship the manual machine using ground

to East Coast"; "give her some black cherry, the Fujimarca gear grease is in the

living room on the shelf above the spoon straws"; and "I will ship juicer from

Hawaii, just pack the machine."  *Id.*

Third, on July 30, 2013, William Hsia sent emails to Kevin Sun with

various instructions.  *Id.*  In one email, William Hsia tells Kevin Sun to provide an

inventory count of flavors so Mr. Hsia can stock Mr. Sun's flavors.  *Id.*  In another,

William Hsia tells Kevin Sun to purchase "small shave ice machine[s]" to resell,

instructing him to "contact the suppliers on [HTK's] behalf" and listing factors Mr.

Sun should consider when making the purchases.

Fourth, on August 31, 2013, William Hsia emailed Kevin Sun, among

others, a list of directions.  *Id.*  Included in this list are instructions such as: "Kevin

please coordinate with Calvin about bringing 'local' inventory to mainland to sell";

"Kevin - Will need to learn the machines as good as possible, along with knowing

how to make a shave ice for next year.  Winter time is training time so ask and

learn as much as you can.  Please also brainstorm any ideas you may have to

improve our California sales with me and Calvin."; and "Kevin will keep his

contact with our LA customers . . . .  Take your customers/potential out to lunch!

If I don't receive some food receipts, it means you guys are not asking them."  *Id.*

These facts, taken together, permit a reasonable inference that

William Hsia had a "right to control" Kevin Sun pre-Document, which would

qualify Kevin Sun as an employee under California law.

But the same is not true post-Document.  The Suns identify that HTK

paid Kevin Sun a monthly salary of $3,000 pursuant to the Document, ECF No.

147-5 at 96:8-12, but this does not demonstrate any "control" over Kevin Sun post-

Document.  Regardless of the Document's contractual validity, it changed the

relationship between the Hsias and the Suns, and the Suns have failed to put

forward any evidence that the Hsias continued post-Document to exert any control

over Kevin Sun whatsoever.  Thus, HTK's motion is granted as to the post-

Document time period as to counts 6, 7, 8, and 9 of the Suns' Counterclaim.

> 3. *Unlawful and Unfair Methods of Competition*

HTK contends that the Suns' claim, under section 17200 of

California's Business & Professions Code, fails because it does not allege an act

that falls under any of the three categories of the law.  ECF 154-2, at 32-35.  The

court disagrees, as the Suns clearly allege a violation of California Labor Code.

Section 17200 defines "unfair competition" to include three

categories: "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus.

& Prof. Code § 17200.  "Its coverage is sweeping, embracing anything that can

properly be called a business practice and that at the same time is forbidden by

law."  *Cel-Tech Comm'ns, Inc. v. L.A. Cellular Tele. Co.*, 20 Cal. 4th 163, 180, 973

P.2d 527, 539 (1999) (citations and quotation marks omitted).

The Suns clearly allege multiple violations of the California Labor

Code.  ECF No. 105-1, ¶¶ 123-51.  California courts have already used California

Labor Code as a qualifying law under section 17200.  *See People v. L.A. Palm,*

*Inc.*, 121 Cal. App. 3d 25, 33, 175 Cal. Rptr. 257, 262 (Cal. Ct. App. 1981) ("That the Labor Code provides similar relief against unlawful labor practices cannot foreclose cumulative remedies under the Business and Professions Code if the alleged misconduct does indeed constitute an unfair business practice.").

The Suns' employment law claims suffice to support this unfair competition claim.[12] Because their unfair competition claim relies on a finding that HTK violated the California Labor Code, their unfair competition claim is limited in scope to those acts relevant to the labor code violations covering the pre-Document time period.

---

[12] HTK also seeks summary judgment on three other claims made by the Suns. First, the court denies the motion as to the breach of the implied covenant of good faith and fair dealing claim. During the September 26, 2016 hearing, the parties agreed that this claim cannot stand under Hawaii law. If California law applies, the court's ruling on the Document's contractual validity precludes summary judgment here. *See Woods v. Google, Inc.*, 889 F. Supp. 2d 1182, 1994 (N.D. Cal. 2012) (applying California law and requiring the plaintiff to show "(1) the plaintiff and defendant entered into a contract"). Second, HTK seeks summary judgment on the promissory estoppel and breach of fiduciary duty claims asserted by the Suns. Because HTK only spends two sentences on each claim and cites no law or evidence, the court also denies the motion as to these claims. "[W]hen deciding summary judgment judges are not 'like pigs, hunting for truffles [in the record].'" *Valvanis v. Milgroom*, 2008 WL 2164652, at *6 n.13 (D. Haw. May 22, 2008) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

# V.  **CONCLUSION**

For the multiple reasons set forth above, the Suns' Motion for Summary Judgment, ECF No. 146, is DENIED, and HTK's Motion for Partial Summary Judgment is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

DATED: October 7, 2016 at Honolulu, Hawaii.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*HTK Hawaii, Inc. v. Sun*, Civ. No. 15-00114 JMS-RLP, Order: (1) Denying Defendant's Motion for Summary Judgment, ECF No. 146; and (2) Granting in Part and Denying in Part Plaintiff's Motion for Partial Summary Judgment, ECF No. 154; Exhibit "A"



Contract Agreement For HTK California

Purpose of contract: This is a agreement between Kevin and Nicole Sun (buyers) and William and Kim Hsia (sellers). William and Kim Hsia is the owner of HTK Hawaii Inc and it's subsidiaries. The buyers are hereby agreeing to purchase and be responsible for 50% of all gross sales and profits of HTK Hawaii's sales in the mainland for the sum of $250,000 paid over the period of three years starting January 2014.

Contract terms and conditions:

- Selling price of $250,000 paid through 3 years starting January 2014.
- Early payoff option is available. There will be no interest in the amount financed by the sellers.
- 50% offer includes all year end profits for all mainland sales including website orders, phone orders, and all other sales shipped by mainland office excluding inter-office transfer (i.e. transferring products from mainland office to Hawaii office, shipping and whole sale product charges paid for by Hawaii office).
- Price does not include current equipment and real estate as of December 2014.
- Buyer and sellers will share all rent, mortgages expenses as well as all supply inventory, improvements costs that are relating to HTK Hawaii's mainland business.
- Buyer and seller will share all executive decisions relating to mainland business including business operations, expenses, etc.
- Kevin will have a salary of $36K annually paid from both parties, before bonuses.
- Kevin will be added to HTK corp documents as a director or _____(other title).
- The buyer and seller will not open another related business without the other party's knowledge.
- Buyer and seller will have to maintain to the very least our current profit and gross as of year 2013 for upcoming years.
- If the company were to decline or lose money within the first 3 years, William and Kim will have the option to purchase back the 50% at fair market value.
- In the event that Kevin is incapacitated, ownership of the company will be transferred to Nicole, however William and Kim will have the option to purchase back the 50% at the most recent value if Nicole is unable to succeed Kevin's responsibilities.
- Ownership of the company will be passed on to children (if any).
- If Kevin and Nicole were to see that the business is unfit for their needs, they may have the option to sell the share back to William at the current value provided that everything is in agreeable terms.
- The share will not be able to be resold to a third party. If Kevin and Nicole wishes to relinquish t heir share, it will have to be back to HTK Hawaii and no other company or individual.

**Exhibit A**



- William cannot sell his 50% of mainland share to a third party. In addition, given that mainland business is a branch business of HTK Hawaii Inc, William will maintain HTK Hawaii Inc.
- If for any reason HTK Hawaii Inc. ceases to operate as a business, and since mainland business is not yet fully established as an independent entity, William will return Kevin's 50% share of the mainland business at the initial purchasing price of $250K
- William will provide all invoices relating to mainland business expenses and costs for Kevin's review. Since most invoices are kept in Hawaii, Kevin will have full access to invoices, documents that are pertinent to mainland business.
- Accounting for profits and expenses of mainland business will be kept separate from Hawaii business for easier profits calculation (no confusion at year's end). Kevin will keep his own books in mainland as his own records.
- William will open a bank account for mainland business for general operation costs (it doesn't have a large amount, but enough for things like office supplies, and/or product supplies we have to purchase in mainland)
- William and Kevin will both work towards expanding mainland business, establishing legal licensing, warehouse, etc, as soon as condition permits.

Signatures

Sellers:

William Hsia                                    12/12/13

Kimberly Hsia

Buyers:

Kevin Sun                                       12/26/2013

Nicole Sun                               12/26/13

**Exhibit A**